# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5762 | **DATE** | 4/8/2004 |
| **CASE TITLE** | Federal Trade Commission vs. Bay Area Business Council, Inc., et. al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.] .

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion and order, FTC's motion for summary judgment is granted. Judgment shall be entered against all defendants, jointly and severally, in the amount of $12,563.962.34; and a permanent injunction shall issue against the defendants as set out by a separate order. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | APR 0 9 2004 | |
| | Notified counsel by telephone. | | date docketed | 112 |
| ✓ | Docketing to mail notices. | | GMA | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| MF | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

Minute Order Form(06/97)

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No: 02 C 5762 |
| | ) | |
| BAY AREA BUSINESS COUNCIL, INC., | ) | Judge John W. Darrah |
| a Florida corporation, et al. | ) | |
| | ) | |
| Defendants. | ) | |

DOCKETED
APR 0 9 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff, the Federal Trade Commission (the "FTC"), filed suit against Defendants, Bay Area Business Council, Inc.; Bay Area Business Council Customer Service Corporation; American Leisure Card Corporation; Bay Memberships, Inc.; Sr. Marketing Consultants, Inc.; Special Technologies, Inc.; Peter J. Porcelli, II; and Bonnie Harris. The FTC alleged Defendants violated the Federal Trade Commission Act, 15 U.S.C. § 45(a), and the Telemarketing Sales Rule, 16 C.F.R. § 310.3(a)(4). Presently before the Court is the FTC's motion for summary judgment against the above-named Defendants. For the following reasons, that motion is granted.

## LEGAL STANDARD

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims

or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (*Celotex*). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that a genuine issue of material fact exists and to show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986) (*Anderson*); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (*Matsushita*); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

## BACKGROUND

Defendants failed to respond to the FTC's motion for summary judgment Rule 56.1(a) Statement of Facts. Instead, Defendants submitted a three-page response brief asking for "an evidentiary presentation at trial" with "affidavits" stating unsupported and irrelevant conclusions. Defendants' failure to comply with Rule 56.1(b) results in accepting as true all facts set out in a Rule 56.1(a) statement. *See Smith v. Lamz*, 321 F.3d 680, 682-83 (7th Cir. 2003). Even though

Defendants failed to respond to the FTC's statement of material facts and such facts are deemed admitted, the FTC's motion for summary judgment will only be granted if it can demonstrate that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *See Johnson v. Gudmundson*, 35 F.3d 1104, 1112 (7th Cir. 1994). Accordingly, the undisputed facts, for the purposes of this motion, taken from the FTC's Local Rule 56.1(a) statement of material facts (referred to herein as "Pl.'s 56.1") and exhibits, are as follows.

The FTC is an independent agency of the United States created by statute, 15 U.S.C. § 41-58. The FTC is charged with enforcement of Section 5(a) of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Sales Rule, 16 C.F.R. Part 310, which prohibits deceptive or abusive telemarketing acts or practices. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the Telemarketing Sales Rule, and secure equitable relief as may be appropriate in each case, including restitution for injured consumers, pursuant to 15 U.S.C. §§ 53(b), 57b, 6102(c), and 6105(b). Pl.'s 56.1 ¶ 3.

Defendants, Bay Area Business Council, Bay Area Customer Service, American Leisure Card, Bay Memberships, Sr. Marketing Consultants, and Special Technologies, are Florida corporations, with their principal place of business at 801 West Bay Drive, Largo, Florida 33770. Collectively, these Defendants are known as the "Corporate Defendants." Pl.'s 56.1 ¶ 4.

Defendant Porcelli is the owner and Chief Executive Officer of the Corporate Defendants, and he actively participated in the Corporate Defendants' operations. Pl.'s 56.1 ¶ 5. Defendant Harris is the corporate Secretary and Treasurer of Defendants Bay Area Business Council and Sr.

3

Marketing Consultants, and she also held herself out as the corporate Secretary and Treasurer of American Leisure Card. Harris actively participated in the Corporate Defendants' operations. Pl.'s 56.1 ¶ 6.

Bay Area Business Corporation and American Leisure Card, through telemarketers, made sales to consumers all over the United States, including Illinois. Pl.'s 56.1 ¶ 7. Defendants are "sellers" or "telemarketers" engaged in "telemarketing" as those terms are defined in the Telemarketing Sales Rule, 16 C.F.R. §§ 310.2(r), (t), and (u). Pl.'s 56.1 ¶ 8. American Leisure Card did business as "First American Leisure Card" or "1st American Leisure Card." Pl.'s 56.1 ¶ 9.

Bay Area Business Council sold "MasterCards" to at least 90,000 consumers from about June or August 2001 through about July 2002. Pl.'s 56.1 ¶ 10. American Leisure Card sold "MasterCards" to at least 32,000 consumers between June 1, 2003 and August 15, 2002. Pl.'s 56.1 ¶ 11.

Bay Area Business Council and American Leisure Card entered into contracts with Assail, Inc., a company located in St. George, Utah. Under these contracts, Assail performed or hired others to perform telemarketing for Bay Area Business Council and American Leisure Card. Pl.'s 56.1 ¶ 12. Telemarketers representing Bay Area Business Council and American Leisure Card told consumers or led consumers to believe they would receive credit cards with substantial credit limits for an advance fee. Pl.'s 56.1 ¶ 13.

On January 30, 2002, a Bay Area Business Council telemarketer called a consumer, identified herself as "Jacky" from Bay Area Business Council in Largo, Florida, and offered the consumer a MasterCard with a fixed interest rate of 6.5% and a limit of $20,000.00 for an

4

advance fee of $399.00. "Jacky" gave the consumer Bay Area Business Council's customer service number, 1-800-339-1392. The conversation was tape recorded. Pl.'s 56.1 ¶ 14.

Bay Area Business Council and American Leisure Card provided their telemarketers with Training Manuals that included telemarketing scripts. Pl.'s 56.1 ¶ 15. Bay Area Business Council's telemarketing scripts open by saying, "Hello, is (Customer Name) home? My name is (Rep Name) and I'm calling from Florida's Bay Area Business Council. Our records indicate that within the past 12 months, you filed an application for a credit card and you are now eligible to receive your MasterCard." Pl.'s 56.1 ¶ 16. American Leisure Card's telemarketing scripts open by saying, "Hello, is (Customer Name) home? My name is (Rep Name) and I'm calling from Florida's American Leisure. Our records indicate that within the past 12 months, you filed an application for a credit card and you are now eligible to receive your MasterCard." Pl.'s 56.1 ¶ 17.

Both scripts then ask a series of questions to "verify" personal information about consumers, then state, "Mr./Mrs. (Customer Name) based on your information you are guaranteed to receive a MasterCard that does not require a security deposit with an initial pay as you go limit of $2000." Pl.'s 56.1 ¶ 18. The scripts further state, "And nothing Mr. _____ looks better on your **Equifax credit report** than a **MasterCard**. Pl.'s 56.1 ¶ 19 (emphasis in original). The scripts identify Bay Area Business Council and American Leisure Card as "credit card reseller[s]." Pl.'s 56.1 ¶ 20.

Bay Area Business Council and American Leisure Card charged consumers a "one-time processing" fee, typically $174.95 or more, plus up to $24.95 for "shipping and handling." Pl.'s 56.1 ¶ 21. Some Bay Area Business Council customers were charged an advance fee of $399.00.

Pl.'s 56.1 ¶ 22. The scripts state that the advance fee "covers the cost of processing the MasterCard order" and "once your fee clears your card is mailed guaranteed." Pl.'s 56.1 ¶ 23. Bay Area Business Council and American Leisure Card also charged consumers an additional $10.00 or more per month. Pl.'s 56.1 ¶ 24.

Bay Area Business Council and American Leisure Card received payments from consumers by having funds debited from consumers' bank accounts. Pl.'s 56.1 ¶ 25. From about July 2001 through November 2001, Bay Area Business Council collected payments from consumers by using checks created by Bay Area Business Council or its agents in Bay Area Business Council's bank account, number 01113599449, at Huntington National Bank. Pl.'s 56.1 ¶ 26. From about September 2001 through August 12, 2002, Bay Area Business Council and, subsequently, American Leisure Card and Bay Memberships collected payments from consumers by withdrawing funds directly from consumers' bank accounts through automated clearing house processing. The automated clearing house processor was Global eTelecom, located in Destin, Florida. Pl.'s 56.1 ¶ 27.

After debiting consumers' bank accounts, Bay Area Business Council and American Leisure Card sent out packages to consumers. Both companies' packages were substantially the same except for company logos and letterhead. Pl.'s 56.1 ¶ 28. These packages sent to consumers did not contain a MasterCard credit card or any other functional card. Pl.'s 56.1 ¶ 29. The only "card" in the packages sent to consumers was a non-functional "facsimile card" with a MaseterCard logo and the name "Bay Area Business Council" or "1[st] American Leisure Card" on the front and a painted-on, non-magnetic black strip on the back. Pl.'s 56.1 ¶ 30.

The packages Bay Area Business Council and American Leisure Card sent to consumers also contained an application for a "stored value" card. Pl.'s 56.1 ¶ 31. A "stored value" card is a type of debit card that cannot be used until the consumer "loads" funds onto the card by depositing those funds in a bank account. The consumer can only spend the amount of funds that the consumer already had deposited in the account. No credit was extended by use of the card. Pl.'s 56.1 ¶ 32.

In order to receive a stored value card, Bay Area Business Council and American Leisure Card customers had to send additional funds, typically $15.00, $25.00, or more, to Bay Area Business Council or Sr. Marketing Consultants. Pl.'s 56.1 ¶ 33. Most or all of the Bay Area Business Council customers who sent the additional funds to Bay Area Business Council prior to December 2001 did not receive stored value cards, which were supposed to be provided through Mark Filipo of Apex Bank Card Services ("Apex"). Pl.'s 56.1 ¶ 34.

From about December 2001 onwards, the only stored value card available to Bay Area Business Card and American Leisure Card customers was the "ChexCard" issued by Merchant Bankcard Services Corporation, 724 Bank of America Tower, 6300 Ridglea Place, Fort Worth, Texas 76116 and Stonebridge Bank. Pl.'s 56.1 ¶ 35. To obtain a ChexCard, Bay Area Business Council, and American Leisure Card customers had to fill out and send to Sr. Marketing Consultants a "MasterCard Acceptance Form" that was included in their packages, along with $15.00 in "certified funds," such as a money order or cashier's check. Pl.'s 56.1 ¶ 36.

Bay Area Business Council and American Leisure Card customers were not told about this $15.00 fee during the telemarketing sales calls. They also were not told about the additional amounts they would have to pay to load their own money onto the ChexCard or to use the

7

ChexCard in a transaction. Pl.'s 56.1 ¶ 37. Acceptance forms submitted to Sr. Marketing Consultants without the $15.00 fee in certified funds were rejected. Pl.'s 56.1 ¶ 38.

Sr. Marketing Consultants received a total of about $34,283.25 in these $15.00 fees, which corresponds to about 2,286 customers. Pl.'s 56.1 ¶ 39. Fewer than 2,000 customers of Bay Area Business Council and American Leisure Card received ChexCards, and only about 18 of these customers actually used the ChexCard. Pl.'s 56.1 ¶¶ 40-41. Moreover, Defendants did not report information about Bay Area Business Council or American Leisure Card customers to credit reporting agencies; and ChexCards do not appear on credit reports. Pl.'s 56.1 ¶ 42. Throughout 2001 and 2002, there was no limit on the amount of money that a cardholder was permitted to load onto a ChexCard. The amount loaded onto the card was left to the discretion of the cardholder. Pl.'s 56.1 ¶ 43.

Between November 2001 and July 2002, Bay Area Business Council received over nine-hundred written consumer complaints forwarded by the Better Business Bureau, state attorneys general's offices, other governmental officials, and private lawyers. Pl.'s 56.1 ¶ 44. Bay Area Business Council had a customer service department located on the sixth floor at 801 West Bay Drive in Largo, Florida, until about February 2002, when it moved into Suite 203 in the same building. Suite 203 was next door to Suite 201, where Porcelli and Harris had their offices. The toll-free numbers for Bay Area Business Council, American Leisure Card, Sr. Marketing Consultants, and Bay Memberships all were for phones in Suite 203. Pl.'s 56.1 ¶ 45.

Kristen Davis was the Customer Service Manager. She was responsible for hiring, firing, and training customer service representatives and handling complaints that came in by telephone. She supervised a staff of about 30 representatives, each of whom handled an average of fifty or

more customer calls per day. She was assisted by Christopher Tomasulo. Pl.'s 56.1 ¶ 46. On a daily basis, Davis and her staff received hundreds of calls from customers who complained that the package Bay Area Business Council or American Leisure Card sent them did not contain a credit card, and the telemarketers had promised them credit cards. These calls continued through August 15, 2002, when the business was closed. Pl.'s 56.1 ¶ 47. From about June 6, 2002 to August 14, 2002, Davis compiled and faxed to Assail lists identifying over 4,000 Bay Area Business Council and American Leisure Card customers who called customer service and complained that the telemarketers had promised them credit cards. Pl.'s 56.1 ¶ 48.

The customer service representatives were trained to "rebuttal" customer complaints and try to "save deals." The representatives were given scripted responses to the most common customer complaints, including "I thought this was a credit card" and "Why is my card not in the package?" The representatives were also given scripted responses to "frequently asked questions" from customers, including "Why are there so many negative things about the company on the internet and with the BBB [Better Business Bureau]?" Representatives were required to "rebuttal" customers at least three times before releasing customers from future $10.00 monthly payments or initiating the refund process. Pl.'s 56.1 ¶ 49.

The customer service representatives had access to recordings made during the telemarketing calls, which they were able to play for customers over the phone. Only a portion of each telemarketing call was taped. Before taping started, the telemarketer delivered a sales pitch, obtained the customer's bank account information, and told the customer the billing date for their "MasterCard." Then a "verifier" would come on the line, begin recording the call, ask the customer certain questions, and play a pre-recorded "disclosure." The resulting tapes were

known as "verification tapes." Pl.'s 56.1 ¶ 50. The representatives often played verification tapes for complaining customers. Some customers responded by pointing out that the sales pitch was not on the tape. Some said they could not hear the "disclosure" or that it was too fast to understand. Often the tapes supported customers' complaints. Pl.'s 56.1 ¶ 51.

In January 2002, Porcelli and Tomasulo set up a shift of "quality control" employees to listen to verification tapes after telemarketing calls. The "quality control" employees rejected some sales and flagged other sales as "weak" or "damaged" if certain types of misrepresentations were found on tape, based on criteria devised by Porcelli. The "quality control" employees routinely found tapes on which consumers were told the product was a credit card. Pl.'s 56.1 ¶ 52. On or about January 11, 2002, Tomasulo asked the taping contractor, Voicelog L.L.C., to increase the speed of the disclosure played for Bay Area Business Council customers. Pl.'s 56.1 ¶ 53.

In May 2002, the State of Montana warned Bay Area Business Council that its telemarketing script indicated the product being offered was a credit card and prohibited sales to Montana residents. Pl.'s 56.1 ¶ 54. American Leisure Card began making sales to consumers in June 2002; and, at the same time, Bay Area Business Council started winding up its affairs. Bay Area Business Council stopped making sales in July 2002. Pl.'s 56.1 ¶ 55.

American Leisure Card had only one employee, Alan Aronson, who worked in an office in Sunrise, Florida, about two-hundred and fifty miles from Largo, Florida. American Leisure Card's bookkeeping, customer service, shipping of packages to customers, and some of its telemarketing sales were handled by employees of the other Corporate Defendants in Largo. Pl.'s 56.1 ¶ 56. Harris handled American Leisure Card's finances. American Leisure Card's

revenues were transferred on a daily basis by Harris and her staff from American Leisure Card's bank account to other corporate accounts to pay for, among other things, Bay Area Business Council's payroll, customer service payroll, vendor payments, and the payroll of Special Technologies. Pl.'s 56.1 ¶ 57.

Bay Area Business Council Customer Service served as the customer service arm of Bay Area Business Council. Its employees answered incoming telephone calls on Bay Area Business Council's customer service line and reported to Kristen Davis, the Customer Service Manager. Pl.'s 56.1 ¶ 58. Bay Area Business Council Customer Service, doing business as "Bay Area Business Council," filed telemarketing registrations required by law in ceratin states. Pl.'s 56.1 ¶ 59.

Sr. Marketing Consultants, although a separate corporation, was identified as a "d/b/a" of Bay Area Business Council. Pl.'s 56.1 ¶ 60. Sr. Marketing Consultants entered into contracts to obtain the stored value "ChexCard" provided to certain Bay Area Business Council and American Leisure Card customers. Pl.'s 56.1 ¶ 61. Sr. Marketing Consultants charged Bay Area Business Council or American Leisure Card about $9.00 for each "MasterCard Acceptance Form," otherwise known as a "certificate," that was included in a Bay Area Business Council or American Leisure Card package. Sr. Marketing Consultants also charged Bay Area Business Council or American Leisure Card customers who submitted the acceptance form a $15.00 fee. Pl.'s 56.1 ¶ 62. Between 90 to 100 percent of Sr. Marketing Consultants sales of certificates were made to Bay Area Business Council and American Leisure Card. Pl.'s 56.1 ¶ 63.

Sr. Marketing Consultants had about four employees, including Porcelli's mother-in-law, sister-in-law, and brother-in-law, who processed the certificates and the $15.00 money orders or

cashier's checks received from Bay Area Business Council and American Leisure Card customers. Porcelli's in-laws lived and worked at his mother-in-law's house in Dunedin, Florida. The fourth Sr. Marketing Consultant employee, Paul Walford, worked both at the house in Dunedin and at 801 West Bay Drive in Largo, "updating data and taking inventory of the certificates." Pl.'s 56.1 ¶ 64.

From late January to April of 2002, about $74,727.00 in checks drawn on a Bay Area Business Council account and signed by Porcelli or stamped with his signature were deposited into Sr. Marketing Consultants' account, number 36201801, at People's Bank. From early February to April of 2002, about $69,500.00 was withdrawn from the same Sr. Marketing Consultants' account via a series of checks written to a Bay Area Business Council employee named Tammy Walsh, who brought the money back to 801 West Bay Drive in the form of cash and gave it to Harris. Pl.'s 56.1 ¶ 65.

Bay Memberships was a corporation Porcelli created on July 25, 2002, for the purpose of billing customers of Bay Area Business Council. Bay Memberships never had any employees. Porcelli created Bay Memberships because of the "detrimental press and criticism" directed at Bay Area Business Council as a result of its "complaint backlog" and because the bank processing customer payments for Bay Area Business Council refused to continue processing these payments. Pl.'s 56.1 ¶ 66. Bay Memberships started debiting consumers' bank accounts on the day it was formed, July 25, 2002, just one day after Bay Area Business Council stopped debiting accounts. In the weeks prior to August 15, 2002, Bay Memberships debited the bank accounts of thousands of Bay Area Business Council customers without giving those customers notice that Bay Memberships would debit their accounts. Bay Memberships collected about

$200,000.00 from Bay Area Business Council customers during the three weeks Bay Memberships operated but never provided those customers with anything. Pl.'s 56.1 ¶ 67.

Bay Memberships was obliged to pay commissions in perpetuity to Bay Area Business Council and Assail. Pl.'s 56.1 ¶ 68. Bay Memberships' revenues were transferred on a daily basis by Harris or her staff from Bay Memberships' bank account to other corporate accounts to pay for, among other things, Bay Area Business Council's vendor payments, acquisitions, refunds, payroll, and customer service payroll, and Special Technologies' payroll. Pl.'s 56.1 ¶ 69.

Special Technologies began operations in June or July of 2002, and became the employer of certain customer service representatives, Kristen Davis, the customer service manager, and Anita Coorey, the Compliance Officer, all of whom were previously employed by Bay Area Business Council. Special Technologies employees continued to perform the same duties they had performed as Bay Area Business Council employees. Pl.'s 56.1 ¶ 70. Special Technologies handled order processing, customer service and fulfillment for American Leisure Card, using the same facilities as Bay Area Business Council Customer Service. Special Technologies' only "client" was American Leisure Card. Pl.'s 56.1 ¶ 71. In July 2002, Harris or her staff transferred funds from a Bay Area Business Council bank account to Special Technologies to cover Special Technologies' payroll and vendor payments. Pl.'s 56.1 ¶ 72.

Porcelli decided that Bay Area Business Council would sell "MasterCards" through telemarketing. Pl.'s 56.1 ¶ 73. Porcelli negotiated and signed the contracts between Bay Area Business Council and Assail and between American Leisure Card and Assail. He authorized

13

Assail to retain call centers to market the "MasterCards." Pl.'s 56.1 ¶ 74. Porcelli reviewed the telemarketing scripts. Pl.'s 56.1 ¶ 75.

Porcelli knew Bay Area Business Council and American Leisure Card customers were complaining that they had been promised credit cards. Porcelli had his own personal list of hundreds of consumers who complained to Bay Area Business Council that its telemarketers had promised them credit cards. Pl.'s 56.1 ¶ 76. Porcelli knew offering a card with a $2,000.00 "limit" could easily lead consumers to believe that they were being offered credit cards. Pl.'s 56.1 ¶ 77. Porcelli and Anita Coorey, who reported to Porcelli, handled legal compliance and customer complaints and made decisions on refund requests. Porcelli personally designed the list of customer complaints, known as the "complaint grid," and also designed the refund request forms. Pl.'s 56.1 ¶ 78. Porcelli signed contracts on behalf of Bay Area Business Council and Sr. Marketing Consultants with vendors of stored value cards. Pl.'s 56.1 ¶ 79. When Porcelli was out of the country, he received daily written reports from Harris on quality control, bookkeeping, cash flow, inventory, and customer complaints, including the "complaint grid," which he reviewed in order to "keep an idea of what was going on." Pl.'s 56.1 ¶ 80.

In March 2002, Porcelli, with the assistance of Anita Coorey and Wade Cloud, his regulatory consultant, discussed an effort to convince the Better Business Bureau to improve its negative report on Bay Area Business Council. Porcelli drafted a letter to the Better Business Bureau addressing: (1) misrepresentation by the sales entities, (2) billing disputes, and (3) requests for funds. The effort was not successful. Pl.'s 56.1 ¶ 81. Porcelli knew that Bay Area Business Council and American Leisure Card customers who had received the stored value ChexCard were complaining about the card. On or about May 13, 2002, Kristen Davis warned

Porcelli that Merchant Bankcard Service Corp., the issuer, with Stonebridge Bank, of the ChexCard, was receiving complaints that Bay Area Business Council was leading customers to believe they would receive credit cards. Porcelli set up a special refund request procedure for these customers so the bank would not have to act as a "MASH Unit." Pl.'s 56.1 ¶ 82.

On or about June 24, 2002, the State of North Carolina sued Porcelli, individually, for fraudulent telemarketing of advance fee credit cards; and the court entered a temporary restraining order ("TRO") against Porcelli and his co-defendant, Bay Area Business Council, barring sales to North Carolina residents. A consent order extended the TRO indefinitely. After being sued, Porcelli instructed the customer service department not to "rebuttal" customers from North Carolina. Pl.'s 56.1 ¶ 83.

On or about July 23, 2002, Porcelli proposed to Alan Aronson, the sole American Leisure Card employee, that American Leisure Card would make sales for about six months, until about January 2003. Thereafter, a new sales entity would be formed, with Aronson as officer and Porcelli as signatory on checks and stockholder, to be followed by successor entities. Porcelli predicted complaints against American Leisure Card would "cause inquiries from regulators;" but "the turndown of sales will make it disappear from the radar screen to pursue." Pl.'s 56.1 ¶ 84. On or about August 6, 2002, Porcelli explained to Aronson that the different entities, including American Leisure Card, that were handling sales, complaints, order processing, customer service, and fulfillment "both of the package and the card" were involved in a "collaborative effort" and were "interdependent." Pl.'s 56.1 ¶ 85. On or about August 12, 2002, Porcelli received a copy of the Better Business Bureau's report on American Leisure Card finding a pattern of complaints from American Leisure Card customers who had been offered an

unsecured MasterCard with a credit line of $2,000.00 or more for a one-time fee of $199.00. Pl.'s 56.1 ¶ 86.

Harris was responsible for hiring, training, supervising and firing employees; paying the telemarketers and stored value card vendors; moving funds among the various accounts of the Corporate Defendants on a daily basis; and bookkeeping. Pl.'s 56.1 ¶ 87. Harris had signing authority on the corporate bank accounts for all of the Corporate Defendants. Harris was also authorized to use Porcelli's signature stamp. Pl.'s 56.1 ¶ 88. Harris periodically served as Bay Area Business Council's "Compliance Manager" or "Compliance Officer" and assumed responsibility for responding to consumer complaints and ensuring compliance with the law. Pl.'s 56.1 ¶ 89. Harris had knowledge regarding "MasterCard" sales, returns, customer complaints, and telemarketing scripts. Pl.'s 56.1 ¶ 90.

Both Porcelli and Harris knew that only a small percentage of Bay Area Business Council and American Leisure Card customers received stored value cards. Pl.'s 56.1 ¶ 91. Defendants claim they received payment from approximately 90,000 consumers and paid refunds to approximately two percent of them. Pl.'s 56.1 ¶ 92.

From August 1, 2001 through March 4, 2002, the total amount of money that Bay Area Business Council received from consumers through unsigned "telephone checks" deposited at Huntington National Bank, minus the dollar amount of returned items, was at least $838,599.45. Pl.'s 56.1 ¶ 93. From September 4, 2001 through August 15, 2002, the total amount of money that Bay Area Business Council, American Leisure Card, and Bay Memberships received from consumers through automated clearing house processing performed by Global eTelecom, after rejects, returns, and refunds, was at least $11,886,317.19. Pl.'s 56.1 ¶ 94. The total of these two

16

amounts the FTC discovered at Huntington National Bank and Global eTelecom is

$12,724,916.24. From August 1, 2001 through August 30, 2002, the total amount of refunds

paid from the Defendants' refund account at First National Bank of Florida was $160,954.30 or

less. Pl.'s 56.1 ¶ 95. Subtracting this amount from the total amount which Defendants received

from customers leaves a total of $12,563,962.34.

## ANALYSIS

The FTC brought a four-count Amended Complaint against Defendants. Count IV

alleges Defendants sold credit cards for an advance fee in violation of the FTC Act and the

Telemarketing Service Rule. Counts I and III allege that Defendants sold a product and failed to

deliver that product in violation of the FTC Act and the Telemarketing Service Rule. Finally,

Counts I and II allege that Defendants sold a product or service and then demanded payment of

undisclosed fees in violation of the FTC Act and the Telemarketing Service Rule.

To establish that Defendants engaged in deceptive acts or practices in violation of Section

5 of the FTC Act, the FTC must demonstrate that Defendants made material misrepresentations

or omissions that were likely to mislead consumers acting reasonably under the circumstances.

*E.g., Kraft, Inc. v. FTC*, 970 F.22d 311, 314 (7th Cir. 1992) (*Kraft*). A statement or practice is

material if it is likely to affect a consumer's decision to buy a product or service. *FTC v. World

Media Brokers, Inc.*, No. 02 C 6985, 2004 U.S. Dist LEXIS 3227, at *20-21 (N.D. Ill. Mar. 2,

2004). After the FTC establishes a particular claim has been "widely disseminated," the burden

shifts to Defendants to show that consumers did not rely on that claim. *FTC v. World Travel

Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988) (*World Travel*).

Under Section 5(a) of the FTC Act, omissions of material fact are deceptive. *See World Travel*, 861 F.2d at 1029. Courts look to the "overall net impression" of consumers when deciding whether particular statements or omissions are deceptive. *Kraft*, 970 F.2d at 315. "Deception may be made by innuendo rather than outright false statements," *National Bankers Services, Inc. v. FTC*, 329 F.2d 365, 367 (7th Cir. 1964); and statements can "create deceptive impression on purchasers even though they may be technically interpreted as true or partially true." *L.G. Balfour Co. v. FTC*, 442 F.2d 1, 17 (7th Cir. 1971).

Under the Telemarketing Sales Rule, "[b]efore a customer pays for goods or services offered," a seller or telemarketer must "disclose, in a clear and conspicuous manner . . . [a]ll material restrictions, limitations, or conditions to purchase, receive, or use goods or services that are the subject of the sales offer." 16 C.F.R. § 310(a)(1)(ii). Sellers and telemarketers may not make any "false or misleading statement[s] to induce any person to pay for goods or services." 16 C.F.R. § 310.3(a)(4). Sellers and telemarketers also may not request or receive payment of any fee in advance of obtaining or arranging a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit. 16 C.F.R. 310.4(a)(4). Under Section 3(c) of the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), violations of the Telemarketing Service Rule constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

Here, no genuine issue of material fact exists as to whether Defendants sold credit cards for an advance fee in violation of the FTC Act and Telemarketing Service Rule. From

approximately August 2001 until August 2002, Defendants, through their telemarketers, widely disseminated their claims by calling consumers throughout the United States claiming to sell "MasterCards." Defendants then requested payment of fees in advance of consumers' receiving credit by telling and leading consumers to believe that for advanced fees of $199.00, which were debited from the consumers' bank accounts, they would receive credit cards with substantial credit limits.

No genuine issue of material fact exists as to whether Defendants sold a product and failed to deliver that product, in violation of the FTC Act and the Telemarketing Service Rule. Defendants made material misrepresentations to mislead consumers who would have reasonably otherwise acted under the circumstances. Although Defendants represented that consumers would obtain credit cards, Defendants never provided, nor intended to provide, actual credit cards to consumers. Instead, consumers received a package of materials consisting of promotional literature and a membership compact disc which promised free benefits. This package also included a card with the MasterCard logo and either the name "Bay Area Business Counsel" or "1st American Leisure Card" on the front. On the back of the cards was a non-magnetic black strip. Thus, the cards looked like a credit card but did not function as a credit card.

Defendants, though, scripted their sales pitches to mislead consumers by insinuating that consumers would improve their credit ratings by obtaining these cards. Defendants' telemarketers were instructed to begin their sales by referencing the consumer's recent application for a credit card and then telling the consumer that he or she was now eligible to receive a MasterCard. After guaranteeing consumers that they would receive a MasterCard, the

telemarketers emphasized that MasterCards would be favorably reflected on Equifax credit reports.

As a result of these statements, Defendants received numerous calls each day from complaining consumers. Defendants received hundreds of complaints from the Better Business Bureau and state attorneys general, as well. Customer Service Representatives employed by Defendants, however, were instructed to "rebuttal" any consumer complaints, and scripted responses were provided for the most common customer complaints; these acts further misled consumers by making material misrepresentations.

The overall net impression of consumers demonstrates that the failure to disclose information about the stored value card was deceptive. Only about two percent of Defendants' customers, who had previously paid $199.00 for this so-called "credit card," filled out the stored value card application and paid the additional required fee. Of that group, almost none of the customers used the card because they were led to believe they were going to receive a credit card, or they learned that it cost additional money just to use the card.

No genuine issue of material fact exists as to whether Defendants sold a product and then demanded payment of undisclosed fees in violation of the FTC Act and the Telemarketing Service Rule. The information in the packet also included an offer to purchase a "stored value card" for an additional $15.00. This card functioned as a debit card that could only be used to withdraw funds previously deposited with the issuer by the cardholder. During the telemarketing sales pitch, neither Defendants nor their telemarketers disclosed to consumers that customers would have to pay an additional fee simply to use the debit card. In addition, as mentioned above, the subsequent conduct of customers demonstrates that the failure to disclose these fees

20

was deceptive; customers who had obtained the card, upon learning it would cost additional money to use the card, chose, instead, not to use the card.

"Where one or more corporate entities operate in a common enterprise, each may be held liable for the deceptive acts and practices of the others." *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000), *rev'd in part on other grounds*, 312 F.3d 259 (7th Cir. 2002) (*Think Achievement*). To determine whether corporate entities constitute a common enterprise, courts look to see if the entities: (1) are under common control, (2) share common office space and offices, (3) transact business through a "maze of interrelated companies," and (4) commingle funds. *Think Achievement*, 144 F. Supp. 2d 1011 (citations omitted).

In this case, no genuine issue of material fact exists as to whether all the Defendants operated in a common enterprise. Each of the Corporate Defendants was owned by Porcelli and was ran by the same people. The Corporate Defendants often times shared the same offices. These Defendants did business under each other's names and accessed the same customer bases. Finally, the proceeds of these dealings were shared and transferred, as needed, between the Corporate Defendants. As Porcelli admitted, this enterprise was a "collaborative effort."

Individuals may also be liable for corporate violations of the FTC Act if the FTC can show that the individual Defendants: (1) actively participated in or had authority to control a corporation's deceptive practices, and (2) the individuals knew or should have known about the deceptive practices. *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573-74 (7th Cir. 1989) (*Amy Travel*). Authority to control a company can be established by demonstrating that an individual assumed the duties of a corporate officer. *Amy Travel*, 875 F.2d at 573. Whether an individual knew or should have known about a company's practices may be shown by that individual's

21

degree of participation in business affairs. *Amy Travel*, 875 F.2d at 574. Moreover, the "knowledge" requirement does not require that an individual subjectively intend to defraud consumers but, rather, only requires that a defendant knew or was aware of a misrepresentation. *Amy Travel*, 875 F.2d at 574.

Porcelli owned all of the Corporate Defendants; and he formed, directed, controlled, and participated in their acts and practices. Therefore, no genuine issue of material fact exists as to whether Porcelli had authority to control the Corporate Defendants.

Furthermore, no genuine issue of material fact exists as to whether Porcelli knew about the Corporate Defendants' deceptive practices. Porcelli was intimately involved with all of the Corporate Defendants' operations. He decided to sell these "MasterCards," and personally negotiated and signed the contract with the Assail telemarketing firm that called consumers on behalf of the Corporate Defendants. Porcelli also reviewed these Corporate Defendants' telemarketing scripts and was intimately involved in the refund process. Porcelli was also aware of the customer and law enforcement complaints made against the Corporate Defendants. He knew that only a small percentage of their customers eventually received some version of a functional card.

Porcelli, after he was personally sued by the State of North Carolina, devised and implemented the plan to set up a series of new corporations without obvious ties to himself or Bay Area Business Council. American Leisure Card was to continue selling these cards for about six months, and then a new sales entity was formed. This entity would use one of Porcelli's employees as an officer, but Porcelli would still sign the checks and be the stockholder. Other successor entities would then follow. This plan was designed to reduce the number of

complaints against American Leisure Card and insulate new companies from actions against Bay Area Business Council.

Harris, the other individual Defendant, was an officer of Bay Area Business Council and held herself out as an officer of American Leisure Card. Accordingly, no genuine issue of material fact exists as to whether Harris had authority to control the relevant Corporate Defendants.

Moreover, no genuine issue of material fact exists as to whether Harris knew about the relevant Corporate Defendants' deceptive practices. She was intimately involved with both the sales and financial operations of the Corporate Defendants. Harris participated in the hiring, training, and firing of employees. She kept the books for the Corporate Defendants, paid the telemarketers; and she personally arranged and signed off on moving funds among the various bank accounts of the Corporate Defendants on a daily basis. Harris also acted as a compliance manager for the Corporate Defendants, had personal knowledge of the information in the telemarketing scripts, and knew about the customer complaints received by the Corporate Defendants.

The FTC seeks both injunctive relief and damages for Defendants' business practices. On October 2, 2002, a preliminary injunction was entered against Defendants, enjoining Defendants from continuing these sales practices. Defendants have failed to present any facts or reasons for why their deceptive business practices should not be permanently enjoined. Accordingly, the permanent injunction sought by the FTC is granted.

Pursuant to § 13(b) of the FTC Act, 15 U.S.C. § 53(b), consumer redress is also an appropriate remedy. *FTC v. Security Rare Coin & Buillon Corp.*, 931 F.2d 1312, 1315 (8th Cir.

1991); *see also Amy Travel*, 875 F.2d at 571-72 (permitting a district court to grant ancillary equitable relief such as restitution under § 13(b)). To obtain redress, the FTC is not required to prove individual reliance on Defendants' material misrepresentations and omissions. *E.g., FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993) (*Figgie*).

Consumer redress is also appropriate under § 19(b) of the FTC Act, 15 U.S.C. § 57b(b). This section authorized relief necessary to redress injury resulting from violations of an FTC rule affecting unfair or deceptive business practices, such as the Telemarketing Service Rule. Congress has provided that such relief may include, but is not limited to, "recession or reformation of contracts, the refund of money or return of property [and] the payment of damages. 15 U.S.C. § 57b(b). Even if Defendants' product was of some minimal value, damages are properly measured as the total net sales to consumers when the deceptive sales practices were widespread. *See Figgie*, 994 F.2d at 606-07 (stating that, absent the deceptive business practices, the amount spent on a product for which consumers otherwise would not have paid is the proper measure of damages); .

To determine the proper amount of redress, the FTC is required to "show that its calculations reasonably approximated the amount of customers' net losses, and then the burden shifts to the defendants to show that those figure were inaccurate." *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997) (*Febre*). To the extent that either the Defendants' records create uncertainty in determining the amount of redress or the Defendants' failure to produce relevant evidence makes it impossible to accurately determine the proper amount, the "risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." *Febre*, 128 F.3d at 535.

Here, Defendants' inconsistent and sometimes contradictory admissions regarding their

24

total net sales have created uncertainty in determining the proper amount of redress for consumers. In responding to the FTC's motion for a preliminary injunction, Defendants claimed to have over "225,000 customers in [their] database, with well over 35,000 continuing customers." In their answer to the FTC's Amended Complaint, Defendants claimed to have at least 122,000 customers in their database, with 18,228 "active" customers and only 3,500 "rejected" sales. At the time their business was shut down, Defendants claimed that more than 1,500 of these "active" customers had debited a monthly fee for six months, more than 2,800 for seven months, and more than 1,200 for eleven months. According to the FTC, if these assertions are true, their total net sales would have been, at a minimum, at least $25 million.

Defendants' records also create uncertainty in determining the proper amount or redress for consumers. The FTC, however, did obtain banking and other financial records from third parties suggesting that Defendants' total net sales may have been less than what Defendants claimed. While it appears Defendants may have booked sales and attempted to debit more than $40 million from customers' bank accounts, the vast majority of these charges were rejected by the customers' banks. The FTC has only verified net sales of $12,563,962.34, after all rejects, returns, and refunds have been calculated.

Defendants have failed to submit any material in a Rule 56.1(b) statement and have not otherwise met their burden to show this figure was inaccurate. Thus, no genuine issue of material fact exists that the total net sales to consumers and the proper amount of redress is $12,563,962.34.

## CONCLUSION

For the foregoing reasons, the FTC's Motion for Summary Judgment is granted.

Judgment shall be entered against all Defendants, jointly and severally, in the amount of

$12,563,962.34; and a permanent injunction shall issue against the Defendants as set out by

separate order.

Dated: *April 8, 2004*

JOHN W. DARRAH
United States District Judge